and we'll take a few minutes to let the courtroom settle down after we change attorneys and then we'll get started. Whenever you're ready, Mr. Jones, you may begin. Good morning. It's a bit of an unusual situation for me because this is a case where neither side requested oral argument. And I not only did not request oral argument, I requested that we not have oral argument because I thought that there was so much error in this case. I didn't feel comfortable airing the dirty laundry in public. But we're here at your invitation and we're here to talk about whatever you want to talk about. There's a little something for everybody in this case as far as 1983 claims go. There's a Fourth Amendment issue. There's a Monero issue. There's a qualified immunity issue. There's a Dauber issue. There's a state law issue. Why don't we start with the qualified immunity issue? So as I read the record, it seems to me that whether the officers are entitled to qualified immunity or not is dependent on whether a reasonable officer could believe that your client might have had access to a weapon underneath his body when he wasn't showing his hand. Would you agree with that? I would agree with that, but I would agree that the rule is totally established going from Levy-Ferraro all the way up to Ingraham v. Kubrick. The issue is not whether the law is clear. The issue is whether the facts viewed from the standpoint most favorable to the plaintiff would establish a violation of that fully established rule. Right, but to establish a violation of the rule, I think, again, if there's something I'm missing, you let me know, but to establish a violation of the rule, your client would have to show that no reasonable officer could believe that his life was at risk because your client wasn't giving his hand and they couldn't see what was under there. Right? I mean, isn't that what it boils down to? The case would create a presumption that deadly force is justified in all cases because you never know. It's got to be based upon the facts as apparent to a reasonable officer, and that needs to be viewed from the standpoint of the facts most favorable to the plaintiff. The jury has to decide those facts. There are rare cases where the court may need to withhold a ruling on assembly judgment until there's been a final fact by the jury. But the facts in this case are that he's on the ground. He can't move. He's got two officers on top of him. He's getting blows to the head. He's getting blows to the rib cage, which was sufficient to cause a life-threatening injury. We took a look at those videos, and they don't reflect that he was hit or that there was a struggle after he was handcuffed, which seems to indicate, I mean, he ran away. It seems to indicate that they were just attempting to subdue him and handcuff him. I don't see any hits after he was handcuffed. They were just trying to handcuff him. Do I have it wrong? Am I misreading the videos? No, but you've also got to consider the testimony of the officers, too, that they admit that they're throwing those blows. And we've got testimony from the medical examiner, former chief medical examiner for the state of Georgia, that those blows were qualified as deadly force. But wasn't – let me ask you a question, though. Yes. Didn't one of the officers testify that he thought he saw the plaintiff doing something with his hands near his waistband, and so that's what his concern was, that the plaintiff might have a weapon. And so he kept asking him to show his hands or demanding that he show his hands, and he didn't do so. I understand your client's position is, I couldn't do so. They were under me. You know, I was on top of my hands, and I couldn't get them out. And that's – you know, that, I guess, would be understandable. But the problem is if the officers – if no reasonable – let me put it this way. If a reasonable officer could believe that he was willfully not providing his hands for cuffing when they thought they saw him fidgeting near his waistband for a weapon, doesn't that present a problem for your client under the qualified immunity analysis? And if it doesn't, why doesn't it? If a jury believed the officer's self-serving statement that he thought he might be reaching for the waistband, which is a standard defense in these cases, there's no evidence they ever made a move for his waistband after they did hand it out. But here's the problem. The video does not disprove that. If the video disproved it, then I think you'd be golden. But the problem is the video doesn't disprove it, and there's no other evidence in the record that disproves it. And so even when we look at the record in the light most favorable to your client, we're still left with this officer's statement. Why is that not the case? Because my client's testimony is otherwise, and the interpretation of the video by an expert also creates an issue. Your client's testimony is he couldn't move his hands, not that no reasonable officer would think that he could move his hands, right? I mean, that's the problem, right? Both things can be true. Your client could have not been able to move his hands, but if a reasonable officer thought that he could move his hands and was just refusing to cooperate, that's a problem for your client. And so I think what you need to do in order to show that there's not a qualified immunity problem here is show either that there's evidence in the record that contradicts the officer's testimony, that he thought that your client was fidgeting near his waistband and trying to get a weapon and not providing his hands, or you need to show that the video somehow shows that. I've watched that video multiple times. In fact, I've watched their different videos from different angles, and I'm not seeing it. It's possible I missed something. I mean, the action happens very quickly, so it's a little hard to tell what's going on at some points. But I couldn't see anything that disproved the officer's statement that he thought that your client was fidgeting near his waistband and trying to get a weapon. But I might have missed something. So if you think I did, direct me to the part of the video that you think shows that or the other evidence. Well, totally common sense. You've got to look at the facts in the light most favorable planet. Otherwise, the rule would be if someone is incapable of showing their hands, it's okay as a matter of law to break their ribs and collapse their lung, and that just can't be the law. Now, with regard to whether he's handcuffed yet or not, there are cases that draw that distinction, but there are also cases that say that that's not a bright line. For example, the Patel v. Madison case, which I've cited, the 2020 case, and also citing the Stevens v. DiGiovanni case from 2017, rejects the argument that the precedent prohibiting the use of gratuitous and excessive force against non-resisting suspects applies only with the suspect's handcuff. Even if he's, he doesn't have to be handcuffed. It can be excessive if he's incapable of meaningful resistance. And if he's unable to move, he's unable to resist. And that's certainly a position. Let me just, let me try one more time. Yes. Focusing on any evidence that would show that the officer who said he thought he saw your client fidgeting near his waist and trying to get a weapon, right? Yes. Is there anything in the record that disproves that? There's no reference anywhere to a weapon anywhere on the video. There's no comment about a weapon. This is simply the culmination of a foot chase that ends with this guy on the ground and then stop. Right. He says, show me your hands, show me your hands. He says that multiple times. Show me your hands, show me your hands. And, of course, I understand your client's position. He couldn't. He said I can't or not. He didn't. But I know he was really tangled up and fidget and he could not produce his hands. And breaking his ribs and collapsing his lung did not make it any easier for him to produce his hand. They still had to get off of him. There's a bigger point here, and that is whether it's qualified immunity or not, you can have a Fourth Amendment violation and you can have a Monell liability, even if the officers themselves have individual immunity. And this is a case where there have been several – I went to Knoxburg, reviewed several hundred incident reports, and then looked at several dozen videos where the magic words, you know, minimal and necessary force appeared, looked at the videos, realized that the videos were inconsistent with the reports. The videos showed many cases where excessive force was being used, and reports were clearly documented, and supervisors looked the other way. And even – we've got an admission, which I think is sufficient to get us to a Monell claim. And in the 2020-2021 use of force summary done by the Cobb County Police Department, the administrator says that the use of force policy in 2021, the use of force policy is currently under review to become more in line with state law and case law and reduce confusion and hesitation for the officer, which in turn will result in less injury to everyone involved. My expert points to this pattern, and this statement about the need to revise policy for someone within the department is consistent with his opinion. Now, you go all the way back to Owen v. City of Independence. You go back to this court's decision in Pruitt v. Montgomery. It's very clear that you can have a constitutional violation. It can be pursuant to a custom pattern of practice, and you can have municipal liability for that violation, even if the officers themselves have called that a mistake. So that is our position. And, of course, I feel that the court abused its – this is why I don't like to do this in the morning. I feel the court abused its discretion on the Dalbert claim by saying that the court and the jury was just as capable of looking at hundreds of – hundreds of national reports and hundreds of videos as the expert was, which, number one, is absurd, and number two, they can't do so through the lens of 35 years of law enforcement experience. So I felt that the Dalbert motion ruling was an error, and I think that that is a large part of the basis for the Monell claim, irrespective of the court's feelings on qualified immunity. All right. Thank you so much. That's all right. Let's hear from Ms. Murphree. Thank you. Good morning. Good morning, counsel. May it please the court. My name is Laura Murphree, and I represent the Appalachian – I'm an attorney with the Cobb County Attorney's Office. I agree with what the court has said. This has to be imbued for qualified immunity from the perspective of a reasonable officer at the scene at that time. Now, the court brought up the fact – the real fact about what the officer testified to about he saw something going on around his waistband, and there's nothing to dispute that. In fact, there's evidence that – Well, the evidence to dispute it is his own testimony that I had all these officers on top of me and my hands were underneath, so I couldn't comply with the directive of the officers to show my hands because they were all on top of me. So isn't that a dispute of fact? There was one officer who was on the back side of him. There was one officer that eventually showed up that was on one side of him. One officer standing up, circling around, and then two more officers arrived. There's only one officer who's on the back side of the plaintiff, and that was Officer McDonald after he had just tackled the plaintiff from a higher ledge, falling down on top of him. Well, there must have been – I mean, it seems to be what is consistent with his position that I couldn't move my hands because my hands were – they were all on top of me. What's consistent with that is that he sustained six broken ribs and a punctured lung. Why isn't that consistent with excessive force? That's a lot of injury for just trying to handcuff him and get his hands from behind him. You get six broken ribs and a punctured lung from that? Well, Your Honor, the facts are in this case, when the officer fell on top of him from an elevated – he falls right on top of him. He's 190 pounds. His uniform's another 25 pounds. Flat on top of him like a pancake onto the ground. Officer McDonald testified to consistently that he saw him doing something with his hands at his waistband, ordered him – and while Officer McDonald's video camera is lost in the tussle going through his – if you watch those videos, they're actually like sort of swimming through that dense foliage. He loses his video, but you can hear him ordering the plaintiff to show his hands. Now, undisputed facts. Plaintiff, when he burgled that closed building, was wearing gloves. He admits to that. He's wearing gloves. When he's taken down, when he's finally handcuffed, he doesn't have those gloves on. When he is raised up, those gloves are found in the very proximity that the officer said he saw him doing something with his hands. Officers testified in their deposition they didn't remove those gloves. So the plaintiff clearly, with solid evidence, was doing something with his hands in his waistband that caused the fear of Officer McDonald, who also knew that those suspects, based on the witness, used some instrumentality to shatter a glass door. His own witnesses stated when he would approach from his law enforcement, somebody who just burgled something, someplace, he would always approach with his gun, because it was a serious crime. It's a dangerous situation. So when we go to the Graham factors, which I'll get to the injury in just a second, when we go to the Graham factors, we're talking, is it a serious crime? No doubt, serious crime, a burglary. Had the witness been checked for weapons? No, he had not. He fled before he was checked for weapons. Officers knew at that time he had just shattered a glass door to get to burglary. No doubt about that. So when we get to the assessment, and he was fleeting, he wasn't responding, he wasn't complying with what the officer said. So from the officer's point of view, he's not complying, he's just fled, he's just committed a burglary, he just shattered the door with some instrumentality, it's pitch black, he didn't stop, he saw, I'm in my police uniform, I'm in my patrol car, he acknowledged in his deposition that he knew the police were trying to catch him, he knew he had these warrants, he knew what he just did, that's why he secreted himself in that dense area. So it was a dangerous situation. So when we look at all of the factors of Graham, and then by extension the other cases, force was needed to get him to show his hands, it stopped once he was secure, and yes, he did suffer some injuries. But I mean, he suffered severe injuries. He did suffer severe injuries. But if you go to the case law of the 11th Circuit, Mobley, for instance, a 2015 11th Circuit case, where it says force applied when suspect has not given up, has stopped resisting, and may still pose a danger to the arresting officers, even when that force is severe, as it was in that case, that individual suffered multiple broken bones and teeth kicked out of his face, it's not necessarily excessive force. Yeah, but the officer doesn't have carte blanche to do whatever. I mean, the issue is whether or not the amount of force used was more than necessary in order to subdue him. And so when you sustain six broken ribs and a punctured lung, I mean, we have an issue here about whether or not more force was used than was necessary to subdue him. That's one of the gram factors that is in his favor. There are other gram factors, but that's probably the most significant gram factor that is in his favor. And especially when we look at the evidence in a light most favorable to him, why don't we accept his version of what took place? I couldn't move my hands because they were all on top of me. I was attempting to comply with the directive of the officers, but they were on top of me, and they wouldn't let me move my hands to the back so that I could be handcuffed. Well, your Honor, he had full vocal ability. He was not so broken up that he could not communicate, and he said several times loudly, loudly, this was just after he had jumped over a five-foot, six-foot fence to get away from the building that he just burgled, and to get away from the officers, he loudly says, what did I do? What did I do? When he just knew what he had done. Had he said, I can't, I can't, my hands are stuck, he was fully capable of doing that, and he did not tell the officers that. He did not alert the officers he's trying to comply. So from the reasonable officer's viewpoint, he just fled from me, he's just committed a serious crime, he's not showing his hands, I can't see what his hands are doing, and I see they're doing something. I'm going to do controlled strikes, controlled strikes, controlled strikes, until he complies. He didn't use an asp, he didn't use a gun, he didn't use taser, he didn't do anything in order, further than just controlled strikes until he was able, they were able to secure him. You know, there is, as I said, the officer fell on top of him from an elevated position, and the first outcry the plaintiff made to his first medical provider was, when asked what happened to him, he says, I got tackled by the police. Tackled, and how he got tackled? They went over together and fell. That's what he said first. Then we went to the second location. After he was fully able to unhook all of his equipment, steal a truck during COVID time that belonged to the hospital, get himself in that truck and drive all the way up to Chattanooga to the second medical provider, he says he was in a motor vehicle accident. So, you know, in looking at all the grand factors regarding the Fourth Amendment violation, the court does the decision by law whether it was excessive force. Well, let's turn to Cobb County with the time that you have left.  Cobb County got qualified immunity. So what do we do with the testimony of this expert, William Harmoning, I believe his name is, and he compares a sample of the body and dash cam videos of police interactions with suspects. He compares those with the reports by the officers, and he says there's a pattern of fudging the reports because the explanations they give for the force they use doesn't always consistently match the videos. Why isn't that enough to create an issue of fact with regard to whether there's a Monell liability by Cobb County? Well, we would only get to the Monell if there's a Fourth Amendment violation. So, well, we believe the court did not err in making that decision that there was no Fourth Amendment violation. It did go on to assess the claim. He found that the expert's report was useless. The expert had used, in that particular section of the claim, use of force reports. He didn't look at incident reports. He didn't look at witness interviews. He didn't look at things to put things into totality of the circumstances of what the officers were doing. What he used was a use of force report that Cobb County uses as a statistical paperwork. They did not put in everything they knew or what was happening in that use of force report. It might say, you know, I had to tase. And that's another thing. His whole report, by and large, is about tasers. Well, if all that is true, if all that is true, why is the use of force policy now under review? That was a snippet in an underlying report. Don't know who authored that. No testimony was given other than that was in there. Who made it, was it a low person or a high person, do not know. I can tell you standing right now, policy has not changed. It's the same policy. But going back to the Manel where he says he looked at all these reports, he used a use of force report that had bare bones information. We put in our brief to respond to that, for instance, in some of the samples he uses, where he says, well, they tased the individual while he's running on concrete. Well, we just went ahead and put all that in the record. He's running on grass when he's getting tased. So the judge said the use of force report was useless. So he hasn't met his burden. He hasn't met the burden to show that he abandoned one argument on policy, but the informal court just said that they fleshed their reports. Well, we disagree with that terminology at all. That's how they describe it. But using how he describes it, well, what is it? I mean, you're going to have to show that somebody, a policymaker, made these decisions to continue this informal policy of overstating what the suspect did and understating what the officers did. But it never reached that level because you're saying it's fudged. You can't have it both ways. So they did not satisfy the elements they needed to on Manel. But they didn't satisfy it from the get-go because the court found there was no Fourth Amendment violation. Are there any other questions? So it falls with the court finding no Fourth Amendment violation. Everything does. It wasn't gratuitous. It wasn't excessive under these circumstances where the officers, serious crime, haven't been checked for weapons in this dark, secreted vegetation, noncompliant, been told there's two suspects, actually, and he's not showing his hands. And he is clearly, with the evidence undisputed, that he had those gloves on when he broke in. He took them off under his body because they're there when he's arrested. So with that, we ask this court to affirm the lower court's decision. Thank you, counsel. Mr. Jones, you've got three minutes. All right, perfect. First point is these are not controlled strikes. These are not techniques that were taught. In fact, one of the strikes was what's called a 12-6 elbow strike, which is banned in the MMA, Mixed Martial Arts Association. This is a perfectly appropriate case to tase someone. They're noncompliant. He's not actively resisting. He's passively resisting. He's not fighting. He's just not obeying. And as far as whether he might have, could have, should have, maybe had a weapon or not, the 911 caller saw no weapon. They heard a glass breaking. They saw no weapon. The officer saw no weapon. Usually in a foot chase situation like this, the suspect will toss the weapon, particularly if they're a convicted felon and they're not supposed to have one, as you know from your previous case. He never reached for his weapon. If he was running with a weapon, chances are he'd be holding his waistband so he wouldn't do it. So this statement, well, you know, the waistband defense is subject to credibility determination, just like any of the other evidence in the case. And I would submit to you that if he did have a weapon, the time to reach for it would be before he was pinned underneath the officers when he was trying to get away, not when he was incapable of moving it. Unless you have any questions, I would rest on my brief. Thank you. All right. Thank you, counsel. And our last case of the week is Greg.